*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0109p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

WILLIAM H. SMITH,

*Petitioner-Appellee/
Cross-Appellant,*

*v.*

CARL S. ANDERSON, Warden,

*Respondent-Appellant/
Cross-Appellee.*

Nos. 05-3241/3243

> 

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 95-00320—S. Arthur Spiegel, District Judge.

Decided and Filed: March 6, 2005

Before: SUHRHEINRICH, BATCHELDER, and COLE, Circuit Judges.

SUHRHEINRICH, J., delivered the opinion of the court, in which BATCHELDER, J., joined. COLE, J. (pp. 10-11), delivered a separate opinion concurring in part and dissenting in part.

---

## OPINION

---

SUHRHEINRICH, Circuit Judge. Petitioner William H. Smith, an Ohio death row inmate, is scheduled to be executed on March 8, 2005. On February 28, 2005, the district court issued an order staying the execution to permit Smith to pursue an action under Fed. R. Civ. P. 60(b)(6) regarding his claim of ineffective assistance of trial counsel in failing to present evidence of organic brain damage, and denied Smith's claim of racial discrimination in the selection of the grand jury foreperson.

The Warden asks this Court to lift the stay of execution, on the grounds that the district court exceeded its authority in granting the stay of execution. Smith cross-appeals the district court's ruling denying his grand jury foreperson discrimination claim. The district court has granted a certificate of appealability as to the latter claim.

### I.

On September 27, 1987, Marvin Rhodes discovered the bloody body of his girlfriend, Mary Virginia Bradford, lying stabbed to death on her bed, nude from the waist down. She had been raped, stabbed, and raped again. One color television, one black and white television, and a stack stereo with two speakers were missing from Bradford's otherwise spotless apartment. The coroner's report revealed that Mary had died as a result of ten stab wounds to her upper body and consequent

1

loss of blood.  She was five feet, three inches tall, one hundred sixteen pounds, and a portion of her lungs was missing.  Forensic examination revealed sperm in her vagina and on her abdomen.

On September 28, 1987, Smith confessed to the murder.  He told police that he met Mary at the Race Inn, a neighborhood bar in Cincinnati, Ohio, where he was a regular patron.  He stated that he drove her home and had sex with her, allegedly as compensation for $2,500 Mary owed him for a packet of cocaine.  Smith stated that, because the sex "wasn't good enough," he asked her for "money and stuff."  Mary apparently told him that she did not have any and they began to fight.  Smith claimed that she grabbed a small blade, and that Mary was stabbed in the stomach in the struggle.  He claimed that he removed the knife from her stomach and that she dragged herself to the bedroom.  Smith confessed that when she was lying on the bed, he took off her clothes and had sex with her again.  He then told police that, after the second session of sex, he gathered his things and also took Mary's TVs and stereo.  He stated that he made four trips carrying her things.  Smith also admitted that he decided to have sex with Mary a second time because "she was still breathing then."  *See State v. Smith*, 574 N.E.2d 510, 512-14 (Ohio 1991).

Smith went to trial for Mary's murder in 1988.  A unanimous three-judge panel convicted Smith of two counts of aggravated murder under Ohio Rev. Code § 2903.01(B) and two death specifications for each count under Ohio Rev. Code § 2929.04(A)(7).  They also convicted him of one count of rape under Ohio Rev. Code § 2907.02, and one count of aggravated robbery under Ohio Rev. Code § 2911.01.  In sentencing Smith, the trial court weighed the aggravating factors against the mitigating factors, pursuant to Ohio Rev. Code § 2929.03(D)(3),   The trial court noted that by its verdict, the three-judge panel unanimously found Smith guilty of specifications I and II as to Count One and specifications I and II as to Count Two.  The court then assessed the mitigating factors.  Regarding the nature and circumstances of the offense, the court found that "[t]here is absolutely no question that the defendant purposely, coldly and brutally killed Mary Bradford while committing the offenses of rape and aggravated robbery.  He stabbed the victim ten times and then raped her as the life drained from her body.  This is not a mitigating factor and certainly does not militate for mercy."  As to the character and background of the offender, the trial court acknowledged that Smith "had a difficult childhood," and that "[a]s a result, he developed personality disorders which adversely affected his ability to relate to others."  The sentencing panel stated that it recognized Smith's personality disorder and difficult childhood as mitigating factors.  Finally, in weighing the mitigating factors against the aggravating factors, the sentencing panel concluded as follows:

> A careful and meticulous review of the mitigating factors discloses that the defendant had a difficult childhood. . . . It is the opinion of this three-judge panel that the mitigating factors present pale before the fact that the defendant's actions were plotted, vicious, persistent and utterly callous. Mary Bradford was not stabbed once but ten times.  She then had to suffer the final indignities of being raped by Smith while she lay dying and then having her property stolen.  It is clear that the defendant went to her apartment to obtain "restitution."  He obtained it in a violent and ruthless manner, with absolutely no regard for the life of Mary Bradford.  We find no conduct or provocation on the part of Mary Bradford which would warrant the defendant's lethal response.

*Smith v. Mitchell*, 348 F.3d 177, 195 (6th Cir. 2003).  The panel unanimously concluded that the aggravating circumstances outweighed all the mitigating factors Smith advanced, and imposed the death penalty on each murder count.

After exhausting his state court remedies, Smith filed a federal habeas petition.  He petitioned for relief on two grounds.  First, he alleged that he received ineffective assistance of counsel at sentencing because his trial counsel failed to discover and present evidence of organic

brain damage.  Second, he argued that racial and gender discrimination in the selection of grand jury forepersons impeded his ability to receive a fair trial.  The district court denied Smith's first argument on the merits, finding that Smith had not demonstrated prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984).  The district court denied Smith's second argument on the basis of procedural default.  *See Smith v. Anderson*, 104 F. Supp.2d 773 (S.D. Ohio 2000).

Smith appealed to this Court.  We affirmed the district court's denial of Smith's petition. This Court unanimously concluded that Smith had failed to meet either prong of *Strickland*.[1]   *See Smith v. Mitchell*, 348 F.3d 177 (6th Cir. 2003). We stated that  "virtually all of the mitigating elements that Smith complains of were presented via Dr. Schmidtgoessling's testimony and her mitigation report."  *Id.* at 200.   We further concluded that trial counsel were not deficient for choosing to rely on Dr. Schmidtgoessling because of her expertise and because they knew what her testimony would be from a prior NGRI report.  *Id.* at 203.  We concluded that the only mitigation evidence that had not been presented during Smith's trial was Smith's claim of organic brain damage, and that the only relevant trait that Smith's experts identified from this alleged organic brain damage was "poor impulse control."  *Id.* at 202.  We stated:

> From what we can tell, the *only* allegedly new mitigating evidence that Smith presents is that he suffers from organic brain damage.  That evidence is not compelling, however, because it is not conclusive.  Dr. Smith never states that Smith suffers from organic brain damage.  The closest thing to organic brain damage in Dr. Smith's statement is that Smith was dependent on alcohol, marijuana, and cocaine, and that each of these chemicals affects the central nervous system.  But Dr. Schmidtgoessling herself also documented Smith's substance abuse.  And Dr. Smith merely opined that it was "plausible" that Smith had abused substances on the night of the offense, and that if he did, it was "likely" that Smith's judgment was impaired.
>
> Dr. Dobbins likewise did not diagnose Smith with organic brain damage, concluding only that there is a *"likelihood* of neurological impairment."  Nor did Dr. Dobbins ever explain whether this likelihood of neurological impairment would have impacted Smith's criminal act.  Dr. Burch diagnosed Smith with "*mild* diffuse cerebral dysfunction."  She further stated that Smith's performance was no more than mildly impaired on any of the measures[.]"  More telling, Dr. Burch identified only one deficit that was relevant to Smith's actions on the night of the murder–poor impulse control.  Dr. Burch did not opine that Smith's impairment constituted either diminished capacity or insanity under Ohio law.
>
> Although he faults trial counsel for failing to obtain a neuropsychological examination that would reveal evidence of organic brain damage, post-conviction counsel's efforts on that score were equally unavailing. . . .
>
> Other than the slim evidence of a "mild diffuse cerebral dysfunction," which manifested primarily as poor impulse control, Smith has failed to point to any mitigating evidence that was not actually presented.  Absent the existence of some actual medical proof of an organic brain disorder, there can be no cause in the failure to find and present it, and obviously no prejudice either.  . . . In short, trial counsel's performance was not unreasonable.

*Id.* at 202.  The United States Supreme Court denied certiorari.  *See Smith v. Mitchell*, 125 S. Ct. 278 (2004).

---

[1]The dissenting opinion was limited to the issue of whether a neutral expert would satisfy the requirements of *Ake v. Oklahoma*, 470 U.S. 68 (1985).  *See Smith v. Mitchell*, 348 F.3d 177, 215 (6th Cir. 2003) (Cole, J., dissenting).

On December 29, 2004, the Ohio Supreme Court scheduled Smith's execution for March 8, 2005. *See State v. Smith*, 104 Ohio St.3d 1437 (2004). That same day, Smith fainted and was rushed to the local emergency room, where he had a CAT scan. On February 16, 2005, doctors in the Department of Rehabilitation and Corrections concluded that a follow-up MRI examination would be appropriate and made arrangements for Smith to be taken to Ohio State University. The MRI was originally set for April 1, 2005. The Warden recommended that the DRC move up the date for the  MRI. Smith's MRI was conducted on February 25, 2005.

On February 17, 2005, Smith filed an action in the district court entitled "Motion for Equitable Relief and For Relief from Judgment." Smith asserted that relief under Article III and Rule 60(b)(6) was warranted for the following reasons.

1.   In denying relief as to Smith's grand jury foreperson discrimination claim, the Court found the claim to be procedurally defaulted without conducting the required cause and prejudice analysis. Smith has now obtained affidavits from trial counsel which demonstrate cause for the default; and

2.   In denying relief as to Smith's ineffective assistance of counsel in mitigation claim, both this Court and the Sixth Circuit held that Smith could not establish prejudice. Numerous courts, including the Sixth Circuit, have issued intervening decisions demonstrating that Smith was prejudiced by his counsel's failure to uncover and present evidence of his organic brain impairment. In addition, Smith now has medical support for his claim that he suffers from brain damage.

Simultaneously, Smith filed a motion for stay of execution.

On February 22, 2005, the district court held oral argument. On February 28, 2005, the district court issued an order granting Smith relief under Rule 60(b), as well as its equitable powers under Article III, as to the organicity issue.[2] The court denied relief as to Smith's grand jury discrimination claim. The district court also granted a stay of execution, "until further Order of the Court."

The Warden now moves this Court to lift the stay of execution, on the grounds that the district court was without jurisdiction to vacate its previous judgment and stay Smith's execution, because Smith's Rule 60(b) motion is in essence a second or successive petition under AEDPA. Smith cross-appeals the district court's denial of equitable relief and relief from judgment as to his grand jury foreperson claim.

## II.

Our initial inquiry is "whether the entry of a stay was jurisdictionally proper." *Alley v. Bell*, 392 F.3d 822, 827-28 (6th Cir. 2004), *petition for certiorari filed*, (Dec. 16, 2004) (No. 04-7718). *Alley* controls our analysis in this regard. As we noted in *Alley*, absent extraordinary circumstances, we cannot consider the propriety of Smith's Rule 60(b) motion, or the merits of the underlying claims, unless it is clear that the district court had jurisdiction. *Id.* at 828 (citing *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 110-11 (1998)). Thus, the true question before us is whether

---

[2]The Warden asserts that he obtained updated medical records from the correctional institution on Monday, February 28, 2005, at 10:30 a.m. The Warden notified the district court that  the MRI had taken place on February 25, 2005, and indicated that the results would be available within the next 36 hours. The district court nonetheless issued its order granting relief at approximately 3:00 p.m. on February 28th.

Smith's motion for relief pursuant to Rule 60(b) was the equivalent of a second or successive habeas petition under AEDPA, since under AEDPA, a petitioner must obtain authorization from the court of appeals before a second or successive habeas application can be filed in the district court. 28 U.S.C. § 2244(b)(3)(A). If the latter, then the district court lacked jurisdiction to issue relief because § 2244(b)(3) allocates subject matter jurisdiction to the court of appeals, rather than the district court, in the first instance, over a second or successive habeas petition. *Id.*

In *Abdur'Rahman v. Bell*, 392 F.3d 174 (6th Cir. 2004) (en banc), this Court set forth the law of this Circuit regarding the circumstances in which a post-judgment motion should be treated as a second or successive petition. The court held that "[w]hen the motion's factual predicate deals primarily with the constitutionality of the underlying state . . . conviction or sentence," the motion should be treated as a second or successive petition. *Id.* at 181 (quoting *Rodwell v. Pepe*, 324 F.3d 66, 70 (1st Cir. 2003)). If, however, "the motion's factual predicate deals primarily with some irregularity or procedural defect in the procurement of the judgment denying habeas relief," then it should be treated within the usual standards governing Rule 60(b) relief. *Id.  See also Alley*, 392 F.3d at 828 (discussing *Abdur'Rahman*).

The district court found that Smith's motion for equitable relief from judgment was appropriately brought as a Rule 60(b)(6) motion.

> Although Smith does present newly discovered evidence, he does so to challenge the structural and procedural integrity of the Court's earlier ruling denying relief–he does not attack the conviction and sentence itself. Smith is challenging the nature of the judgment by which it was reached. Ohio, lastly, suggests that Smith's Motion should be characterized as a motion made pursuant to Rule 60(b)(1) or (2), which must be brought within one year of the court's final decision . . . . However, the Court finds the circumstances revolving around this newly discovered evidence–namely, its discovery through no action of Smith, but rather, through the actions of Ohio by having Smith tested at the Mansfield General Hospital–presents the Court with the need to review this evidence. Rule 60(b)(6) which allows a district court to hear the motion for "any other reason justifying relief from the operation of the judgment" is the appropriate route for the Court to consider this important development.

We hold that the district court erred in treating Smith's motion as a Rule 60(b)(6) motion. There is no question that, by its own terms, Smith's claim for relief is based on a "factual predicate [that] deals primarily with the constitutionality of" the underlying federal conviction. *See Abdur'Rahman*, 392 F.3d at 181. Smith asked the district court to vacate its previous judgment based solely on "new" evidence of his alleged brain damage, and the district court held that "[t]here is now new evidence of a brain abnormality. If that abnormality were present at the time of Smith's crime and it would have served to mitigate its sentence, then Smith might not now be facing death." In essence, the district court has reversed its previous decision–and judgment of this Court–based on a new assessment of the possible merit of Smith's claim of ineffective assistance of counsel.

Such a ruling says nothing about the procedural correctness or regularity of the previous habeas adjudication. By contrast, in *Abdur'Rahman,* the en banc court found that the petitioner's Rule 60(b) motion was not equivalent to a second or successive habeas petition where it sought reconsideration on the ground that an intervening Tennessee Supreme Court rule had clarified that the petitioner did not need to seek discretionary review from the state supreme court in order to properly preserve his claims of prosecutorial misconduct in the state court. This Court reasoned that the motion simply related to the integrity of the federal habeas judgment, specifically the basis for the district court's procedural default holding. Thus, the practical result, if granted, would be simply

to reopen the federal habeas proceeding and not to vacate the state criminal judgment. *Abdur'Rahman*, 392 F.3d at 182.

In this case, though, Smith seeks, with his new evidence, to vacate the state criminal judgment. In other words, Smith's claim is "a classic example of a second or successive habeas petition." *Alley*, 392 F.3d at 831. *Alley* is analogous. There, the petitioner brought a Rule 60(b)(6) motion raising three claims: (1) that the intervening decision of *Cone v. Bell*, 359 F.3d 785 (6th Cir. 2004)[3], which upheld an Eighth Amendment vagueness challenge to the Tennessee "heinous and cruel" instruction in a capital sentencing proceeding, demonstrated the district court's error in rejecting his constitutional vagueness challenge the instruction; (2) that he was denied fair consideration of his *Brady* claims due to the withholding of exculpatory evidence in both his state court and federal habeas proceeding; and (3) that the intervening state supreme court decision of *State v. Carter*, 114 S.W.3d 895 (Tenn. 2003), which held that it was error to exclude a defendant's personal correspondence proffered as mitigating evidence, showed that the state trial court unconstitutionally excluded videotaped evidence of Alley's behavior under hypnosis. *Alley*, 392 F.3d at 826-27.

The *Alley* court rejected all three grounds as a basis for relief under Rule 60(b). As to the first basis, the court held that the "factual predicate" of the claim was simply *Cone* itself, and that "the sole relevance of the *Cone* decision to the prior habeas proceeding is that it dealt with the same issues as the parallel constitutional vagueness challenge that Alley brought against the HAC instruction in his own trial." *Id.* at 829. This Court concluded that the petitioner's second argument was "essentially indistinguishable from a standard *Brady* constitutional claim that is being asserted for the first time after the completion of a first federal habeas proceeding., and as such was "a classic example of a second or successive habeas petition." *Id.* at 831. Regarding the third claim, the *Alley* court remarked that it had "considerable doubt as to whether Alley . . . [had] articulated *any* sort of claim for relief, let alone a proper claim for relief from judgment, independent of a constitutional claim, that would escape the strictures of AEDPA." *Id.* at 832. The court further noted that it had no authority to revisit the state supreme court's application of Tennessee evidentiary law to the facts of the case *sub judice*. *Id.* Finally the court stated that if Alley's *Carter* claim had any substance, it must be construed as a claim that dealt primarily with the constitutionality of the underlying sentence. *Id.*

Like the claims in *Alley*, Smith's present ineffective assistance of counsel claim based on "new" evidence "parallels" Smith's ineffective assistance of trial counsel claim based counsels' failure to present mitigating evidence of organic brain damage previously addressed by this Court and therefore is clearly a direct challenge to underlying conviction. "AEDPA therefore forecloses the district court from considering or acting on it, unless and until [the petitioner] satisfies the gatekeeping criteria of 28 U.S.C. § 2244(b)." *Id.*

The district court also relied on intervening decisions, namely *Hamblin v. Mitchell*, 354 F.3d 482 (6th Cir. 2004), *Stankewitz v. Woodford*, 365 F.3d 706 (9th Cir. 2004), and *Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004). These cases can hardly be considered "intervening legal developments" since they do not change the standards found in *Strickland*, standards which have been applied in numerous death penalty cases in this Circuit. And, as stated, any argument premised on them is "obviously 'presents a direct challenge to the constitutionality of the underlying conviction.'" *Alley*, 392 F.3d at 829 (quoting *Abdur'Rahman*, 392 F.3d at 181).

In sum, applying *Abdur'Rahman* and *Alley*, we hold that Smith's motion must be classified as a second or successive habeas petition as to his claim of ineffective assistance of trial counsel for

---

[3]The Supreme Court reversed that judgment at 125 S. Ct. 847 (2005).

failure to present evidence of organic brain damage.  We therefore hold that the district court lacked jurisdiction over Smith's motion, because it is the equivalent of a second or successive habeas petition under 28 U.S.C. § 2244(b).  Because Smith's claim is "substantially equivalent to [a] successive request[] for a writ of habeas," his "inherent authority" argument also fails.  *See Alley*, 392 F.3d at 833.  As there was no proper proceeding upon which to premise the stay, we therefore grant the Warden's motion to vacate the stay of execution.[4]

### III.

In any event, Smith has not presented any evidence, let alone "new" evidence, that calls into question this Court's prior rejection of his claims, and would justify relief of any form.  Admittedly, the CAT scan, performed in December 2004, performed seventeen years after trial, revealed some sort of abnormality on Smith's seventh and eighth cranial nerves.  In support of his motion, Smith relied on the affidavit of a neuroradiologist, Dr. Pleatman, who reviewed Smith's CAT scan and concluded that some sort of abnormality was present on the seventh and eighth cranial nerves.

In the first place, any lesion has no real implications in this case, because the seventh and eighth cranial nerves are not part of the brain.  The seventh cranial nerve primarily controls the function of facial muscles and taste from the tongue.  The eighth cranial nerve primarily relays sound and balance information to the inner and middle ear to the brain.  The seventh and eighth cranial nerves transmit information from various organs and help control muscles.  They do not control decision-making.  Affidavit of Dr. Howard Lederman.  *See also Merck Manual of Diagnosis and Therapy* 1382-83 (Robert Berkow, M.D, et al. eds., Merck Research Lab. 16th ed. 1992); *Merck Manual of Diagnosis and Therapy* 1456-61 (Mark H. Beers, M.D., et al. eds., Merck Research Labs. 17th ed. 1999).  Furthermore, the MRI is consistent with the CAT scan.[5]  It states in its findings that "[t]here are low signal lesions present within the globus palantine bilaterally, which correlate with

---

[4]Smith argues that the district court's stay should remain in place pending the outcome of two similar cases in the United States Supreme Court.  *See Gonzalez v. Crosby*, 125 S. Ct. 961 (2005), and *Thompson v. Bell*, 125 S. Ct. 823 (2005).  We reject this argument.  The issue before the Supreme Court in *Gonzalez* is "[w]hether the court of appeals erred in holding that every Rule 60(b) motion (other than for fraud under (b)(3)) constitutes a prohibited 'second or successive' petition as a matter of law, in square conflict with the decisions of this Court and of other circuits."  *Gonzalez v. Secretary for Dep't of Corrections,* 2004 WL 310625 (July 22, 2004) (Petition for Writ of Certiorari).  The ruling at issue in *Gonzalez* conflicts with the law of this Circuit, as stated in *Abdur-Rahman*.  A ruling either way on this question would not affect the outcome reached here.  The issue before the Supreme Court in *Thompson* is limited to whether "the Sixth Circuit abused its discretion by withdrawing the opinion affirming the denial of habeas corpus relief six months after Fed. R. App. 41(d)(2)(D) made issuance of the mandate mandatory, without notice to the parties or any finding that the court's action was necessary to prevent a miscarriage of justice."  *Thompson v. Bell*, 2004 WL 2337932 (2004) (Petition for Writ of Certiorari).  Again, we fail to see how the outcome of this case will affect the decision at hand.

[5]The Warden also filed a "Notice of Filing" to include a one-page MRI summary and a motion to expand the record to include an affidavit from a neuroradiologist who reviewed Smith's February 25, 2005 MRI results.  Smith filed a motion to strike the MRI summary and opposes the Warden's motion to expand the record.  The Warden's motion is hereby GRANTED.  The MRI summary, although filed after the district court granted the stay of execution, was properly filed in the district court by the Warden, because the court continued to exercise jurisdiction.  Furthermore, a panel of this Court has held that we have inherent equitable power to supplement the record "where the interests of justice require."  *Thompson v. Bell*, 673 F.3d 688, 690 (6th Cir. 2004), *cert. granted*, 125 S. Ct. 823 (2005).

As to Dr. Tomsick's affidavit, which admittedly was not before the district court, we find that "the interests of justice require" its consideration.  The Warden acted diligently in informing the district court of the MRI, and in attempting to present the relevant materials to the district court.  The MRI results are plainly relevant to this Court's determination of whether a stay of execution is warranted.  Finally, it must be remembered that, at oral argument in the district court, Smith requested an MRI at OSU.  Smith should not be able to use the fact that he obtained the result he wanted to delay these proceedings.  Finally, even without Dr. Tomsick's affidavit, our conclusion would be the same, based on the CAT scan results, Dr. Pleatman's conclusion that there was an abnormality on the seventh and eighth cranial nerves, and Dr. Lederman's affidavit that these nerves are not part of the brain and do not control-decision making.  Notably, Smith does not dispute these medical facts.

the CT report, most likely due to calcium," and that "[t]here are a couple of subcortical white matter lesions present." Dr. Christoforidis, the physician who conducted the MRI at OSU Hospital, opined that the lesions were not anything unusual for a patient of Smith's age.  Dr. Thomas Tomsick, a neuroradiologist who teaches radiology at the University of Cincinnati School of Medicine, reviewed the MRI at the Warden's behest.  He concurred in Dr. Christoforidis's assessment. Specifically, he stated that "[t]here were minor lesions on various portions of Smith's brain," but that "[t]hese are quite common and are most often found in people with high blood pressure or some sort of vascular disease." Dr. Tomsick stated that "[i]t is more likely than not that these lesions were not present in 1987, because they usually develop over time, most commonly as a result of high blood pressure or vascular disease."  In Dr. Tomsick's opinion, there were no brain abnormalities that would impact Smith's ability to understand right from wrong.  Nor did he "find any abnormalities that would impact Smith's ability to conform his conduct to the requirements of the law."  Finally, Dr. Tomsick stated that the MRI, which produces far better images than a CAT scan and therefore supersedes it, did not support Dr. Pleatman's tentative diagnosis because "[t]here was no indication in the MRI taken on February 25, 2005 that there are any abnormal masses on any cranial nerves, or in any other area inside of Smith's skull."

Nor is there any evidence linking Smith's alleged "brain damage" and the crime.  Dr. Pleatman made no such suggestion in his affidavit, and Dr. Lederman flatly rejected any nexus: "It is my opinion that any such an abnormality–no matter how severe–would not affect an individual's ability to tell right from wrong.  Nor would such an abnormality affect an individual's ability to conform his conduct to the requirements of the law."

Thus, the CAT scan and the MRI simply do not constitute evidence that Smith suffered from brain damage at the time of the crimes.  Nor are they evidence of a serious mental disease or defect that should have been presented as mitigating evidence.  The CAT scan and MRI show nothing more than an anatomical process that is "quite common" simply as a result of aging.  Morever, it was remote in time–seventeen years– from the rape and murder of Mary Bradford, and regardless of its severity, had no impact on Smith's ability to determine right from wrong.  Finally, the MRI and CAT scan are not evidence of ineffective assistance of trial counsel for failing to discover and present proof of an organic brain disorder, for even assuming that the February 2005 MRI findings would have been present seventeen years ago, lesions on the seventh and eighth cranial nerves would not constitute "organic brain damage" that would affect Smith's cognitive formation.  As we stated previously, "Smith has failed to point to any mitigating evidence that was not actually presented." *Smith v. Mitchell*, 348 F.3d at 202.

## IV.

Lastly, we note that the district court granted entered an order that purports to issue a certificate of appealability as to Smith's grand jury foreperson discrimination claim.  The district court denied Smith's Rule 60(b) motion to reopen proceedings as to that claim.  Therefore, it is not clear to us how the district court would have the authority to grant a COA as to that claim.  In any event, this claim would have to be presented initially to this Court. *See* 28 U.S.C. § 2244(b)(3).

## V.

For the foregoing reasons, we VACATE the stay of execution.

---

### CONCURRING IN PART, DISSENTING IN PART

---

      R. GUY COLE, JR., Circuit Judge, concurring in part and dissenting in part.  I agree with the majority's ultimate decision to vacate the stay of execution and to deny the certificate of appealability.  However, I write separately because I would not rely on the majority's jurisdictional basis to vacate the stay.  I also disagree with the majority's decision to expand the record on appeal to include the affidavit of the Warden's expert.

### I.

      The state relies on *Abdur'Rahman v. Bell*, 392 F.3d 174 (6th Cir. 2004), to show that Smith's motion should be treated as a second or successive habeas petition, and not as a Rule 60(b) motion.  It is true that Smith's claim does not present the same type of irregularity or procedural defect in the federal habeas court as did Abdur'Rahman's Rule 60(b) claim.  Smith is complaining about his trial counsel's ineffectiveness in the state court; he does not challenge an event that occurred in the federal habeas court.  However, the legal landscape created by *Abdur'Rahman* is not yet solid terrain.  The Supreme Court recently granted certiorari in *Gonzalez v. Crosby*, 125 S. Ct. 961 (2005), to address the issue directly presented in *Abdur'Rahman*.  The Supreme Court could adopt the reasoning of *Abdur'Rahman*, or it could set forth a more expansive rule.  Such a ruling could greatly impact whether this Court should treat Smith's claim as a second habeas petition or as a Rule 60(b) motion.  Accordingly, I would not rely on this alterable case law as a basis for vacating a stay of execution.

      Moreover, the majority's reliance on *Alley v. Bell*, 392 F.3d 822, 829 (6th Cir. 2004), is misplaced.  The rule we set forth in *Abdur'Rahman* was clearly a functional one which requires case-specific analysis.  The grounds for Smith's Rule 60(b) motion are not at all analogous to Alley's situation:  Alley's challenge relied on an intervening state court decision and on fraud on the federal habeas court, whereas Smith relies on new evidence to show ineffective assistance of counsel during the penalty phase of his state court proceeding.  Therefore, I do not believe that *Alley* can adequately inform us as to how to handle Smith's motion.

      Nevertheless, I concur in the judgment of the Court regarding the stay of execution, because Smith's motion for equitable relief from the judgment cannot be regarded as a Rule 60(b)(6) motion.  Even if we were to look past the jurisdictional question presented by *Abdur'Rahman* and evaluate Smith's motion under Rule 60(b), his motion would fall under Rule 60(b)(2) and would fail under the one-year time bar.  Accordingly, I respectfully concur in the judgment of the Court vacating the stay of execution.

### II.

      I would deny the Warden's motion to expand the record in this case.  The Warden has presented this Court with an affidavit from a neuroradiologist, Dr. Thomas Tomsick, taken on March 3, 2005.  The affidavit presents Dr. Tomsick's expert opinion of Smith's MRI scan, and concludes that the scan reveals nothing out of the ordinary, and certainly nothing that would suggest an "organic impairment" that would diminish Smith's ability to distinguish right from wrong, or to conform his conduct with the law.  This evidence was not presented to the district court when it issued its stay of execution.  The Warden is now asking that we act as a trial court and evaluate this medical evidence, without providing Smith, who is scheduled to be executed in a matter of days, an opportunity to truly review and counter this evidence.

The Warden cites to Fed. R. App. P. 10(e)(2), to support his argument that this Court should expand the record to include information that the district court did not consider. Our own precedent prohibits us from doing so. As we held in *Inland Bulk Transfer Co. v. Cummins Engine Co.*, 332 F.3d 1007 (6th Cir. 2003), "the purpose of [Fed. R. App. P. 10(e)(2)] is to allow the court to correct omissions from or misstatements in the record for appeal, not to introduce new evidence in the court of appeals." *Id.* at 1012 (internal quotation marks and brackets omitted). *Cf. Sovereign News Co. v. United States*, 690 F.2d 569, 571 (6th Cir. 1982) ("A party may not by-pass the fact-finding process of the lower court and introduce new facts in its brief on appeal."). It is therefore inappropriate and inequitable for this Court to rely on the unchallenged opinion of an expert on appeal to support a reversal of a stay of execution.

I therefore respectfully dissent from the Court's decision to grant the Warden's motion to expand the record on appeal.